State to the next case, Otto Baum v. Workers' Compensation Commission, 4100959. Counsel, please. Thank you and good morning. Brad Elbert on behalf of Otto Baum. Your Honor, this appeal raises a question, a singular question, of whether an employee's rejection of an employer's repeated offers of employment within his restrictions terminates that employer's obligation to continue to pay TTD or to continue to offer work in the future. We realize that this case really revolves around the interpretation of interstate scaffolding, and we would point the Court to page 146 of interstate scaffolding, where the Court specifically addresses and anticipates this exact situation. In interstate scaffolding, the Supreme Court says benefits may also be suspended or terminated if the employee refuses work falling within the restrictions prescribed by his doctor. That's exactly the case that we have before us. There's been a lot of commission law trying to interpret what interstate scaffolding meant. Very few cases from this Court yet. This is one of those cases where we do need some guidance as to what that case stands for, how far does that case go. And in our situation, when we look at interstate scaffolding, first again on page 146, the Court says specifically that the test – well, I'll read the whole thing. It says, when determining whether an employee is entitled to TTD benefits, the test is whether the employee remains temporarily totally disabled as a result of a work-related injury and whether the employee is capable of returning to the workplace. It talks about the Workers' Compensation Act, nevertheless, provides an incentive for the injured employee to strive towards recovery and the goal of returning to gainful employment by providing that TTD benefits may be suspended or terminated if that employee refuses to submit to medical-surgical hospital treatment essential or if the employee fails to cooperate in good faith rehabilitation. But then it goes on and repeats that statement that I just quoted to you. Benefits may be suspended or terminated. It doesn't just say suspended. It says suspended or terminated if the employee refuses to work – to accept work within his restrictions. Now, we think that that language gives this Court the ability to reverse the commission on this basis. Now, we realize that we're only talking about a few weeks of TTD here, but this is a very significant policy question because CORE has, as testified to by Mr. Collins, CORE has a very complex return-to-work program where it tries to get people to come back into the workplace, even if it's doing something as simple as being in the office and reading magazines, to get them in that work mode, get them in that work environment because it recognizes, as do the cases in many of the articles that are out there, the importance of getting an employee back into the work environment as soon as possible to get that mentality. I know when I'm not even injured and I go on vacation for two weeks, I don't want to come back to work. You can imagine in these situations where employees are out to work for a long period of time, complicated by an injury, they don't want to come back to work. So the employers understand they have to take actions that bring that employee back into the environment of the workplace as soon as possible. CORE tried to do that, and I say CORE because CORE and Autobahm are related corporations. Autobahm tried to do that in this case. They made three different offers. The first was on August 26th, the second was on September 9th, excuse me, September 2nd, and the third was on September 9th. And he doesn't accept these offers to return to work. He's off for a period of time. He comes back about three months later and asks for a light-duty work within his indefinitely open for someone to come back in this situation. What about this issue? Is it a fact question for the Commission to decide whether or not the employee is unjustifiably refusing to return to work or to cooperate? I mean, who makes that determination? I think there are some factual aspects to it, but I think when we look at what the Commission said in this case, when they spoke about the interstate scaffolding, while they responded maybe within its rights not to extend another offer of light-duty work after the employee turned down previous offers of light-duty work, that does not negate his liability to pay TTD benefits. I think a fair reading of the Commission's decision is that they felt compelled by interstate scaffolding to say the question is simply have you reached MMI, and this guy hasn't. He gets TTD benefits. I think what they did is they overlooked that language that talks about benefits may also be suspended or terminated if the employee refuses work following within its restrictions. Do you think that's not mandatory on the Commission, is it? It's discretionary with the Commission? I think they have to apply the law as it's written. What does it say? Read it again. Yes. I'll read it right from the decision. No, no, read it from the statute. Well, I was quoting the statute. Which portion are you talking about? When it says that it's within the discretion of the Commission, may in its discretion suspend or terminate. That's D. That's what 19D says, right? Is it any different for a person who doesn't work within their restrictions, or is it mandatory? I think it is mandatory. I think the case law has developed the fact that if you have work offered within your restrictions and you decline it, then you're not entitled to it. What if he declines it for a good reason? If he has a medical excuse, it authorizes him not to be at work. Well, why does it have to be a medical excuse? What if he says, I can't drive to work. My back hurts so bad I can't drive a car. I can't get there. And the Commission believes him. I think in that situation. They suspend him anyway? I think they can, because I think he has to have a medical excuse. They can, but must they? That's my question. What's your authority for the must suspend? As opposed to being within their discretion. I would say that the Commission is entitled to review the facts, but in this particular case, I agree they have some discretion to evaluate the facts. But in this case, the way the Commission worded this language, it appears very clear that the Commission felt they had no choice but to deny because of interstate scaffolding. And I think that that case allows the Commission to make that consideration. There's no acknowledgment whatsoever in this decision that they even had the opportunity to do so. And I think that language at page 7 really says it. The Commission felt that they were obligated to follow interstate scaffolding. TTD, MMI, is he an MMI? No. TTD benefits are awarded. And I think we need some clarification that says that in those situations, to reiterate that interstate scaffolding language. And I think it's important that the court in that case said suspended or terminated. Obviously in this case, there was a period of time where when he did not accept the job offer within his restrictions, that benefits were suspended because we weren't ordered to pay for those periods. We didn't work in September and October and November. But I think it's critical that it goes on to say or terminate. And there's cases cited within the interstate scaffolding case, the Granite City case, which refers to Preston. In Preston, that's exactly what happened. The Kmart offered the gentleman who was on restricted duty, they offered him work within his restrictions. And he said no, it was greeter work. And he said no, I don't want it. And they terminated TTD and went right to the termination of permanency. And that's what should have happened here. And we're asking the court to consider that language and to have a reading of interstate scaffolding which recognizes that in those situations, when repeated offers are made and refused, that the benefits can be terminated. And again, one of the questions I kind of expected was, well, counselor, where do we go along? How much is enough? How much is too much? I would say there's got to be a fact question based on each case. In this case, I think the facts show three offers were made, that was enough. There may be times when three offers are made, but maybe two of them aren't really legitimate offers. In those cases, I don't think we can say there's a hard, fast rule of thumb. But on the case presented to the court, I think there's definitely – it definitely calls for reversal. Well, for the minimum, you're asking for a clarification of whether there's discretion or it's mandatory under prior law. Well, I think that's a fair reading, too. Yes. Well, aside from the language of the statute, which I think does indicate it's discretionary with the commission, was there any evidence in this case that his medical treatments or his physical conditions prevented him from accepting these offers? Is there any evidence in the record? There's some testimony made by the petitioner himself. And we're looking back at the period of time, roughly the late August, early September, when employment was offered within his restrictions, and he was asked, why didn't you show up? And he said, well, you know, I heard the drive. He had all these different reasons why it wasn't appropriate to come in. Well, why couldn't the commission rely on that as a justifiable excuse under the statute? He didn't support that with any type of credible medical excuse. He had doctor's excuses that would allow him to perform limited duty work that covered all the other aspects of his work. He had an ongoing relationship with the doctor. It wasn't like he wasn't going to the doctor. He was very active. I don't think that just because the employee says that, that that's enough. I don't. Not when you're talking about medical, not when we require medical to be backed up, medical aspects of complaints be backed up by medical proof. And it wasn't backed up by medical proof. So what you're saying is, what you're arguing is, is that the medical releases that he had, he would have the burden of overcoming that medical release. Yes. He would have the burden of providing a medical release that encompassed the complaints. That prevented him, he argues, prevents him from taking that offer. Exactly. But as you look at it from an employer standpoint, if you look at those medical releases, there is no other than his testimony that hurts me to drive. There's nothing there that suggests he is not capable of accepting that offer. That's correct. It wasn't even conditional. It wasn't conditional. There was no effort whatsoever made to get around that. You're absolutely right. Thank you. Thank you, counsel. Counsel, please. Good morning. I'm Jean Swee. I represent Mr. Hilton. Good morning, counsel. I think that this is a question of fact, and I think there are lots of times that the commission could have chosen at an earlier time to say that my client was temporarily disabled. When I look at the records, my client saw Dr. Nardone on October 8th of 2008. Dr. Nardone was a neurosurgeon. He recommended physical therapy. He recommended a TENS unit and acupuncture. At that point, the commission could have said, I think he's temporarily totally disabled because he hasn't reached maximum medical improvement. They could have picked the time that Dr. Nord took him off on 10-23-08. He took him off work completely. That's the one week my client did get comp. They could have chosen the time Dr. G saw him on 10-27-08. Dr. G was a podiatrist, and he said he was unable to tolerate sedentary work. Could have picked that time. They picked the time that respondent's doctor saw him on December 10th of 2008. That was the Section 12 exam. Dr. Fletcher did this functional capacity evaluation when my client saw him, said my client was telling the truth, and that he was really, there was physiological reasons for his complaints. That's the date that the commission chose. That's a question of fact. That's why I didn't file an appeal. I think that cases, of course, support the MMI, and you folks have talked about it being in the statute too. Archer Daniel Midland says the time during which a claimant is temporarily totally disabled represents a question of fact to be determined by the commission. The commission's decision will not be upset on review unless it's against the manifest weight of the evidence. In this case, I think that the commission chose the date, December 10th. I think that is a valid date and that it makes sense. I don't think we can use a blanket statement about when you can deny TTD for forever, otherwise it's going to have some really amazing effects on the loss of stream of income to injured people. I'd like to point out that in this case, it would be a very tough ruling for my client. In that first month that my client was off work, he gets hurt in the early part of August. He's not represented. He doesn't know the Comp Act. He's not familiar with interstate scaffolding. Can you believe it? And so Mark Collins might have been their safety man for the respondent. He might have been familiar with all those things. It would be a terribly unfair thing for them to send them to their doctors. Dr. Potter was their doctor. The one at OSF was their doctor. Mark Collins contacted their doctor and got my client's work restrictions changed by fax. My client wasn't even aware of that, what an unequal playing field that would be. So I think that this decision is not against the manifest way to the evidence and we would ask that you affirm it. Thanks. Do you think opposing counsels suggesting a commission felt it did not have discretion under existing case law? I'm sorry, Rendit. That they did not have discretion? Do I think that? No, because they could have picked an earlier time. They could have picked any one of those dates I talked about where my client was clearly not at maximum medical improvement. The docs are suggesting all kinds of treatment that my client could have and he didn't have it. So no, I don't feel it. I think that they said, look, this is your doctor. Your doctor is recommending work hardening. You guys aren't contacting him to get the work hardening. We think you've got an obligation to pay him. Thank you. Anything else? Yeah, I would just point out. Did the commission award the petitioner any TTD benefits for those periods of time that he refused your actual offers of work? No. No, they didn't give it to him. No, they didn't. But the period of time they did give it to him, your client was not offering the work, were you? No, that's correct. You suggest that the commission was required to terminate his TTD as opposed to merely suspend it for the periods when he didn't work. No, I said that the commission, according to interstate scaffolding, can do either. And what I was pointing out earlier... They did do it, did they not, for the two periods when you offered him work and he didn't take it? They did suspend it for the periods where work was offered, which would have been roughly September, October, and November timeframe. And we're not having an issue with that. The point that we're making is that there's authority in, there's language in interstate scaffolding that says that this can be terminated. It could be. It may be. The word is may. It's not must. And it's may be suspended or terminated. They did suspend it for the two periods of time when you offered him work and he didn't accept it. The period of time for which they awarded it, he asked for work and you wouldn't give it to him. That's correct. It was the third time he had been offered work. He had been offered it three times before, and he asked a fourth time, and work wasn't available. And it's our position that in those situations we shouldn't have to continue to make work available. This is a policy implication. When the policy underlying the fundamental purposes they ask... You offer somebody light-duty work, and they haven't reached MMI yet, and they work for two weeks. And then you tell them, guess what, we don't have any more light-duty work for you. Is he entitled to TTD from that point on? Of course he is. So what's different about this? The difference in this situation is that we offered work to this gentleman within his restrictions, and he declined. And you didn't pay him TTD. Three times. You didn't pay him TTD. But you're missing the policy implications of this on employers. The real-world effect of this case is that an employer has to keep a job open indefinitely for somebody. And now one of the problems with the interstate scaffolding case that they tried to worry about in the Supreme Court was, what situation are we creating for an employer that allows an employer to manipulate a system, come up with concocted charges to terminate an employee and end his TTD because, well, he's violated a company rule and we're going to get rid of him. That puts too much power in the employer's hands. In this case, we're putting the power in the employee's hands to give them the ability to manipulate the system. Mr. Elwood, interstate scaffolding, taken to its finest, stands for the proposition that an employee who is entitled to TTD can go in to his employer, tell his employer to go to hell, he hates him, and violate every rule he's got, get fired, and still collect TTD. That's what interstate scaffolding stands for. So don't say that we're putting power in the hands of the employee. That was done by the Supreme Court. I did say that. Your Honor, we ask you to take a close look at this. We think that the authority is in there to reverse this and to send this back, and we think that the policy implications, how this type of ruling would affect the real-world applications and employee situations, I think is significant. And we're asking this Court to take a close look at that issue. Thank you.